THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES McGHEE *et al.,* Defendants-Appellants.

(No. 57760; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

First District (2nd Division)—May 28, 1974.

Paul Bradley, of Office of State Appellate Defender, of Chicago, for appellants.

Bernard Carey, State's Attorney, of Chicago, for the People.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Defendants, James McGhee and Rochester Lowe, were indicted for battery, resisting arrest and aggravated battery. After a bench trial, they were found guilty of aggravated battery.[1] Defendant McGhee was sentenced to 2 years' probation and defendant Lowe was sentenced to 5 years' probation, with the first 90 days to be served in the Work Release Program of the Cook County Department of Correction. On appeal, defendants contend that they were not proven guilty beyond a reasonable doubt, and alternatively defendant Lowe contends that his sentence is excessive.

On May 30, 1970, at approximately 4:30 A.M., Chicago Police Officer Edward Meany stopped a car driven by McGhee at 95th and Oakley streets in Chicago. Meany testified that he observed McGhee speeding and that he followed his car for approximately 8 blocks in a westerly direction before McGhee pulled over and stopped. McGhee got out of his car and Meany asked him to produce his driver's license. While

---

[1] Ill. Rev. Stat. 1971, ch. 38, par. 12—4(b)(6).

McGhee unsuccessfully attempted to locate his license, Meany smelled a strong odor of alcohol. At that point another car driven by Lowe pulled up behind the police squad car and Lowe exited his car and walked up to Meany and McGhee. Lowe told Meany that he could not give McGhee a ticket, whereupon Meany ordered Lowe from the scene. Lowe refused to leave and Meany walked back to the squad car and radioed for assistance.

Approximately 30 seconds later, plainclothes officers Thulis and O'Donnell arrived on the scene in an unmarked car, and they proceeded to order Lowe from the scene. Lowe then left and McGhee was arrested and handcuffed and transported in a police wagon to the 6th District police station. Officer O'Donnell testified that when he and Officer Thulis answered Meany's call, he observed Meany and both defendants arguing. Officer Thulis testified that he observed defendant and Meany speaking, and that he told Lowe that McGhee was going to be arrested and taken to the 6th District station. The remainder of Officers O'Donnell's and Thulis' testimony is substantially identical to Meany's. Meany followed the wagon to the station, Thulis drove McGhee's car to the station and O'Donnell left the scene in the unmarked police car.

Defendant McGhee testified that he was at a party from 9 P.M. until approximately 3:45 A.M. on May 30, 1970. At the party he had drunk only one beer. He left the party in his car and his friend Lowe, who had also been at the party, followed in his car. They were driving in an easterly direction when he observed Meany following with the squad car's blue light and spotlight turned on. He pulled over to an island on the left side of 95th Street and got out of his car. Lowe pulled up to the curb side of the street, and walked over to where he and Meany were standing. He could not find his license in his wallet, although on cross-examination he admitted that the license was in his wallet. When Lowe walked up to him, he asked Lowe to check with his wife to see if he had left it at home. Before Lowe said anything to Meany, Meany walked back to his car, and within 3 or 4 minutes more police arrived and Lowe was told to leave the scene. Meanwhile Meany told McGhee that he was under arrest if he could not locate his license; he was then handcuffed and placed in the wagon. On redirect examination McGhee testified that Meany never stated why he was being arrested.

Defendant Lowe testified that he has known McGhee for approximately 18 years. On May 30, 1970, he left the party and followed McGhee in his car. He was not under the influence of alcohol and he did not see McGhee drink at the party. His car and McGhee's turned onto 95th Street and they proceeded in an easterly direction. At 95th and Halsted Streets he observed Officer Meany driving behind him, pass him and

pull McGhee over. He parked his car, and as he walked up to McGhee and Meany, Meany walked back to his car and a couple of minutes later more police appeared. McGhee told Lowe to call his wife. When one of the detectives told him to leave the scene, he returned to his car and followed the wagon to the police station.

Officer Meany testified that McGhee was brought into an interrogation room at the station, and was seated at one of the tables in the room. Meany was seated at another table and began writing McGhee's tickets and his report on the arrest. Meany and Thulis testified that Thulis was also in the room. Lowe then entered the room "screaming and yelling." Officer O'Donnell entered and before O'Donnell spoke, Lowe picked up a chair and threw it at him. Meany went to O'Donnell's aid and Lowe was subdued. Meany observed McGhee push Thulis, several blows exchanged and Thulis and McGhee wrestling. Meany then went to Thulis' aid and hit McGhee in the head. McGhee was subdued and handcuffed again.

Officer O'Donnell testified that after he left the scene at 95th Street, he answered another call and arrived at the station approximately 15 minutes later. He walked into the interrogation room and observed McGhee, Thulis and Lowe arguing. Lowe turned around, said something, picked up a chair and hit him with it. Lowe and O'Donnell then began wrestling on the floor. O'Donnell testified that during the scuffle Lowe pulled O'Donnell's gun from its holster, and O'Donnell later found it lying on the floor. After O'Donnell subdued Lowe he told him he was under arrest. On cross-examination O'Donnell testified that he was not aware that his gun had been pulled out until another officer handed it to him after the scuffle. He admitted that in his written report he did not mention that Lowe had pulled his gun, and that the first time he made a written statement about the gun was after the Internal Investigation Division's investigation of the incident had commenced. O'Donnell did not see Lowe attempt to take his gun, but he testified that the gun cannot fall out of the holster, and that only he and Lowe were involved in the incident.

Officer Thulis testified that he drove McGhee's car to the station, parked it and walked into the interrogation room in which Meany and McGhee were seated. He walked to the front part of the station to pick up some forms. As he walked back into the room, he observed Lowe follow him. McGhee and Meany were seated and Meany was working on his ticket book. Lowe stated that "as long as you locked up my friend, you might as well lock me up." Thulis told Lowe that the room was for police business and that he had to leave. Lowe then became abusive and stated that he could stay because it was a public building. Voices began to rise and

Thulis again ordered Lowe to leave and he again refused. O'Donnell then entered and Thulis next observed Lowe and O'Donnell wrestling. As Thulis turned to help O'Donnell, McGhee jumped up and pushed Thulis with his hands. Thulis reached behind him and grabbed his nightstick from a table, put one hand at each extremity and pushed it into McGhee's face, knocking his arms aside. Thulis dropped the club and he and McGhee fell to the ground. This struggle lasted 2 to 3 minutes, and three officers were required to subdue and handcuff McGhee.

On cross-examination defense counsel attempted to impeach Thulis by his testimony at the preliminary hearing. Thulis had previously testified that only McGhee was in the room when he arrived. He also previously testified that when O'Donnell entered the room, he left to obtain certain forms. On cross-examination Thulis stated that O'Donnell was struck by Lowe a minute or two after O'Donnell entered the room. He observed the first blow struck by Lowe, then he saw O'Donnell hit Lowe with his fist. McGhee pushed at Thulis with both hands, and then hit him with his right fist. In his previous testimony Thulis omitted any mention of his use of his club, and previously testified that McGhee threw three or four punches and kicked at him, and that Thulis knocked him to the ground and managed to handcuff him. Also at the preliminary hearing Thulis characterized the incident "as a little wrestling match."

Defendant McGhee testified in his own behalf that when Meany took him into the interrogation room, he asked to make a telephone call or speak to the sergeant or lieutenant in charge. Meany replied: "No, you can't do anything." Approximately 1 minute later Thulis entered and McGhee asked "You mean to tell me that I don't have the right to make one call?" Thulis said: "This is another one of those smart niggers. I'll take care of him," and thereupon Thulis hit him across the forehead and face with his nightstick. McGhee did not push or strike Thulis because he was still handcuffed. Lowe entered the room and stated: "You shouldn't be doing this." O'Donnell, who was standing near the door asked Lowe for his driver's license and Lowe complied with the request. O'Donnell threw it back to Lowe and the scuffle between Lowe and O'Donnell commenced. McGhee did not see Lowe pick up a chair, he did not see a chair thrown and he did not see Lowe strike O'Donnell. McGhee testified that he suffered a broken nose and that 7 stitches were required to close a wound in his head.

Defendant Lowe testified that he parked his car at the station and walked into the building. He walked back to a little room and observed Thulis strike McGhee two times with a club. McGhee was handcuffed. O'Donnell came over to Lowe and told him that it was none of his business and asked him for his license. Lowe produced it and O'Donnell

threw it back at him. Lowe then stated: "You don't have to treat me like no dog. I'm coming here voluntary." Lowe picked up his license and threw it back at O'Donnell. O'Donnell then swung at Lowe and he and Lowe began to wrestle. When Lowe was subdued and handcuffed, Thulis stated: "You like to swing back," and proceeded to hit Lowe with his club. Lowe testified that he suffered a "hole" in his head and his hands and back were swollen. Lowe filed a complaint with the Internal Investigation Division, and photographs of his injuries were taken. After the scuffle O'Donnell told defendants to mop up the squad room; they were then taken to the hospital for treatment, and upon their return were placed in the lockup.

On cross-examination the prosecutor asked Lowe if he refused to be fingerprinted and to make a telephone call while in the lockup. Defense counsel objected to the question on the basis that this line of questioning was irrelevant to the charges against defendants. The trial court allowed the prosecutor to continue and Lowe admitted that he spoke with the watch commander while in the lockup, but he denied refusing to be fingerprinted and make phone calls. On redirect examination Lowe stated that the watch commander entered the lockup early in the morning after defendants returned from the hospital. At that time the watch commander requested that defendants be fingerprinted first, and then they could make phone calls.

The defense then rested, and, over defense counsel's objections, the prosecutor called rebuttal witnesses. James H. Williams, Jr. testified that he was the acting watch commander on May 30, 1970. He went on duty at 6:30 A.M., and shortly thereafter he was notified that defendants refused to cooperate and be fingerprinted, and he went to the lockup to speak with defendants. The prosecutor asked Williams his opinion as to their sobriety and he answered "They were uncooperative." He testified that McGhee looked like "he was under the influence of alochol or whatever." He asked defendants to cooperate and he gave them every opportunity to make phone calls. He asked them to be fingerprinted and they refused. He recalled that McGhee's face was swollen and that he had a bandage. He stated that McGhee did not ask to make a phone call before being fingerprinted. He admitted that the first time he made a written statement concerning defendants' refusals was when he was contacted by the Internal Investigation Division.

Charles Freeman, the lockup keeper on May 30, 1970, also testified in rebuttal. He began his shift at 6:30 A.M. on that day and defendants were brought to the lockup at approximately 7:30 A.M. They refused to be fingerprinted and at approximately 8 A.M. he called Lieutenant Williams who came to talk with defendants. Freeman noted a "strong, stale odor

of alcohol" on defendants' breaths. Defendants slept through the morning, and every 2 hours Freeman awakened them and asked them if they would be fingerprinted or make a phone call. At approximately 12:20 P.M. one of the defendants made a call. Freeman could not recall if one of the men was bandaged and he could identify only one defendant. On the arrest reports he noted that both men refused to be fingerprinted at 8:10 A.M.

The State's final rebuttal witness was Officer Meany who identified the three tickets he wrote and the notation he made on one of the tickets that McGhee was driving west on 95th Street when he stopped him. Defense counsel stipulated to the introduction into evidence of the ticket, but stated: "I didn't stipulate to the accuracy of it." On cross-examination Meany admitted that he did not write the tickets on the street; he began writing them in the station prior to the disturbance, and he finished them after defendants were taken to the hospital.

Defendant McGhee testified in surrebuttal that, when he returned from the hospital and was in the lockup, he was in extreme pain; his face was swollen and he could hardly breathe. Lieutenant Williams entered the lockup once approximately 2 to 3 hours after defendants returned from the hospital. Williams spoke only with Lowe. Neither Williams nor Freeman told him that he could make a call. Approximately 5 or 6 hours later another officer entered and told him to be fingerprinted and he complied. After being fingerprinted he was allowed to make a phone call; he phoned his parents about 5 P.M.

Defendant Lowe testified that Freeman told defendants to be fingerprinted and Lowe stated that he wanted to make a call first. Freeman said that he did not care if they ever got fingerprinted and took defendants back to the lockup. Approximately one-half hour later Williams entered with Freeman and asked Lowe to cooperate. Lowe replied: "Why don't you cooperate with me, let me make a call." Williams told him that he would have to be fingerprinted first. Lowe denied making a phone call to his sister at 12:20.

Lowe's sister testified that she received a call from him at approximately 3:30 P.M. She attempted to contact her mother at work, but her mother had already quit for the day.

Lowe's mother testified that she left work at approximately 3:30 and when she returned home, her daughter told her that Lowe had called.

The doctor's reports of defendants' treatment at the hospital were introduced into evidence by stipulation of counsel. The doctor had noted on McGhee's report that he smelled "a heavy odor of alcohol on McGhee's breath." The parties rested and the trial court found defendants guilty of aggravated battery.

From the testimony adduced at trial, it is clear that the evidence was so contradictory as to make a determination of the facts a matter of great difficulty. Such a situation requires great care in the conduct of the trial to avoid the erroneous admission of prejudicial evidence.

Defendants urge reversal of their conviction on the grounds that they were not proven guilty beyond a reasonable doubt in that the officers' testimony was implausible and largely impeached and the trial court relied upon improper rebuttal evidence in determining that the police officers' testimony was credible.

Defendants cite six factors which they believe demonstrate the implausibility of the evidence adduced by the State: 1) Officer Thulis' testimony at the preliminary hearing as to whether he was in the room when Lowe entered is inconsistent with his testimony at trial, and his testimony at trial differed somewhat from Officer Meany's testimony; 2) Officer Thulis' testimony that Officer O'Donnell was struck by defendant Lowe 2 or 3 minutes after he entered the room is inconsistent with Officer Meany's testimony that O'Donnell was struck immediately upon entering; 3) at the preliminary hearing Officer Thulis did not specifically mention striking defendant McGhee with his nightstick; 4) Officer O'Donnell did not state in his report that his gun was pulled from its holster during his struggle with defendant Lowe; 5) there was no testimony that defendant McGhee's handcuffs had been removed prior to the altercation; and 6) the diminutive sizes of defendants in comparison to the police officers indicate that the officers were the aggressors.

■■ In a bench trial it is the duty of the trial judge to determine the credibility of witnesses and the weight to be given their testimony. (*People v. Hampton*, 44 Ill.2d 41, 253 N.E.2d 385.) In the instant case the police officers were cross-examined extensively, and the trial court's attention was directed to all of these matters cited by defendants. Minor discrepancies, such as those pointed out above, are matters of credibility which are for the trial court's determination. (*People v. Bell*, 53 Ill.2d 122, 290 N.E.2d 214.) Although the conflicting evidence in this case presented the trial court with a difficult problem in determining credibility, we are of the opinion that, as a matter of law, the testimony of the police officers was not so unpersuasive or improbable as to raise a reasonable doubt of defendants' guilt. We note that defendants' assertions regarding Thulis' failure to previously mention use of the nightstick, O'Donnell's gun and testimony regarding removal of defendant McGhee's handcuffs are unconvincing, and that reasonable explanations for these matters are reflected in the record when all the testimony is considered.

The alleged improper rebuttal consists of the testimony of the watch commander and the lockup keeper, and the admission into evidence of

the traffic violations written by Officer Meany. During defense counsel's cross-examination of Officer O'Donnell, O'Donnell mentioned the investigation of the incident by the Police Department's Internal Investigation Division. Defendant Lowe also mentioned the investigation by testifying on direct examination that he made a complaint to the "I.I.D." On cross-examination, defendant Lowe denied refusing to be fingerprinted after returning from the hospital. Defense counsel's objection to this question was overruled by the court, and the prosecutor then asked a question regarding the investigation. The trial court stated: "I think it can be explored.  *  *  *  The I.I.D. has been mentioned. It may or may not have some bearing on the case." The prosecutor proceeded to question defendant Lowe regarding his statement to the watch commander concerning his refusal to be fingerprinted and make phone calls. Defendant Lowe was questioned as to the time of day he was fingerprinted and allowed to make a telephone call and as to when his relatives arrived and posted bond, and he was released. The trial court stated that the attempted impeachment "will mean nothing unless they bring the people in." In an extensive colloquy among defense counsel, the prosecutor and the trial court, defense counsel again strongly objected to the prosecutor's attempt to call rebuttal witnesses to testify as to the irrelevant issue of defendants' refusals to be fingerprinted, and stated that impeachment on this issue was unrelated to defendants' request to file a complaint with the Internal Investigation Division. The trial court stated: "I think it is, the whole thing. I have to try and find out who is telling the truth here." The prosecutor stated that the questions show "the attitude, sobriety of the man. It shows everything."

■■  Collateral matters may be gone into on cross-examination for the limited purpose of testing the witness' credibility, and the latitude in cross-examination rests largely within the discretion of the trial court. (*People v. DuLong*, 33 Ill.2d 140, 210 N.E.2d 513.) Rebutting evidence is that which is adduced by the prosecution to explain, repel or disprove evidence given by defendant. (*People v. Karmazinas*, 80 Ill.App.2d 322, 224 N.E.2d 287.) Rebuttal witnesses may properly be called by the prosecution to contradict defendant's testimony as to a material issue; however, rebuttal witnesses cannot be called to contradict defendant's testimony as to a collateral or immaterial matter. (*People v. Dennis*, 47 Ill.2d 120, 265 N.E.2d 385; *People v. Kirkwood*, 17 Ill.2d 23, 160 N.E.2d 766; *People v. Simmons*, 274 Ill. 528, 113 N.E. 887.) Collateral matters are generally considered to include facts irrelevant to the substantive issues in the case and facts which are not independently provable, by extrinsic evidence, apart from impeachment purposes. (McCormick, Evidence § 47.)

Defendants argue that the issue of defendants' conduct in the lockup is immaterial to the substantive issues involved in the case, and therefore, the testimony of the State's rebuttal witnesses was improper. The State maintains that defendants' sobriety at the time of the altercation is a material issue and that the rebuttal testimony contradicts defendants' testimony in this regard. We have carefully perused the record, and we are convinced that the major part of the testimony by Officers Williams and Freeman concerned defendants' refusal to cooperate with the police. This rebuttal testimony covers approximately 70 pages in the record, and the testimony concerning defendants' sobriety consists of one statement by Officer Williams that "McGhee looked like he was under the influence of alcohol or whatever," and statements by Officer Freeman that 1) he smelled a strong odor of alcohol; 2) defendants slept during the day; and 3) he could tell the difference between drinking alcohol and hospital alcohol. On this basis we cannot characterize this testimony, as the State does, as merely contradicting defendants on the issue of their sobriety.

This rebuttal evidence was offered by the State to contradict defendants' testimony concerning their conduct in the lockup after the altercation for which they were being tried. We are of the opinion that this conduct by defendants was collateral to the substantive issues at trial, and thus the rebuttal testimony was improper.

■■ At the conclusion of all the evidence in this case, the trial court commented:

> "Now, in all the conflict and everything else and searching for the truth which is impossible sometimes, the man that meant the most in convincing me is Officer Freeman. * * * I thought out of everybody else that he was the man who proved beyond a reasonable doubt that the State had proven their [*sic*] case.
>
> In taking the men as to the alcoholic thing, he said he was back there. It will say on the record how many times.
>
>    *    *    *
>
> Officer Freeman did mark down what he said about the call and how many times he was there, and he was lockup keeper at that time.
>
>    *    *    *."

In light of these comments, we conclude that the trial court's findings of guilty were based on improper rebuttal testimony, and therefore, defendants were so prejudiced by the introduction of this testimony that a new trial is required. It is apparent that the trial court relied upon the improper rebuttal to determine the credibility of all the witnesses.

In light of our disposition of this cause, we will consider the intro-

duction into evidence of the tickets written by Officer Meany. The notation on one of the tickets was introduced by the State to rebut defendants' statements that they were driving east when defendant McGhee was stopped. As rebuttal evidence, it was used to show the truth of the matter asserted, and therefore, is inadmissible hearsay. The police officer who made the notation had testified as to that issue in the State's case-in-chief, and therefore it is clear that the ticket is not admissible as past recollection recorded. The State does not dispute these conclusions, but argues that defense counsel stipulated to its introduction into evidence. We have reviewed the colloquy which ensued and have found it to be confusing, at best. We are of the opinion, however, that defense counsel did stipulate to its introduction into evidence, and thereby waived any error in its admission.

In view of our decision to reverse and remand for a new trial, we need not consider defendant Lowe's contention regarding excessiveness of his sentence.

Reversed and remanded for a new trial.

HAYES, P. J., and DOWNING, J., concur.