**People of the State of Illinois, Plaintiff-Appellee, v. Melvin Mitchell, Defendant-Appellant.**

**Gen. No. 53,588.**

First District, First Division.

August 17, 1970.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Nunzio D. Tisci, James N. Gramenos, and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Assistant State's Attorney, of counsel), for appellee.

MR. JUSTICE ADESKO delivered the opinion of the court.

The defendant was convicted of armed robbery in a jury trial and was sentenced to a term of not less than eight, nor more than twenty years. On appeal, the defendant contends that the identification evidence was insufficient to prove his guilt beyond a reasonable doubt; that from the evidence in this case and the failure to conduct any pretrial identification procedure, the manner of identification was conducive to mistake; that defendant was denied adequate representation of counsel; and was denied time to prepare his case because of the trial court's refusal to grant a requested continuance.

Due to the similarity of the defendant's contentions regarding the identification in this case, we will review the evidence with regard to those questions. The record discloses that defendant's guilt was predicated completely upon his being identified as the person who committed the crime. The robbery occurred at about 10:00 o'clock in the morning of January 4, 1968, at a Yellow Cab Company garage located at 4611 West Lake Street, Chicago. The company cashier had just returned from a bank with about $3,000 in a money bag. After the cashier parked his car in the garage and while walking towards the cashier's cage, he was accosted by an individual who demanded the money. The cashier struggled with the robber, who finally succeeded in taking the money from him and was struck on the head by the robber. The cashier did not see the person who took the bag, nor the individual who assisted in the crime.

The defendant was subsequently identified at trial as the man who had taken the money from the cashier. This identification resulted from the testimony of three individuals, all employees of the cab company. Wardell Tate, a cabdriver, was present in the garage during the robbery. Tate saw a man approach the cashier, announce a robbery and then take the money while striking the

cashier with a revolver. Tate grabbed this man by holding his hand in which he held the gun. At this time, the accomplice struck Tate with a gun and he released the robber. Tate stated he was unconscious for a while from the blow to his head but that he "never was all the way out." He also said his knees buckled but he managed to look up and see the robbers going out of the garage. Tate said he had observed the individual with whom he struggled in the garage earlier that day. The defendant was then pointed out by Tate as that person. Following the date of the robbery, Tate next saw the defendant sometime in February, when the case was called in court. Defense counsel established that the witness had not participated in any lineup or showup in this case.

Tate stated further that the lighting conditions were good on the date of the crime; that the robbery took about five or six minutes; and that he was within three or four feet of the cashier when the money was taken. Tate's description of the robber was that of a dark complexioned male, 5 feet 8 inches tall, about 35 to 40 years old, and weighing about 160 pounds. The robber's clothing was described as a green sweater, black slacks, dark glasses, coat and hat. Tate was unsure of the colors of the outer garments and was not positive if the robber had a mustache or a goatee. Tate said the robber's hair was dark and he observed no long sideburns. When asked about his observing the robber, he responded: "It happened so quick, you didn't have time to watch him." Then Tate stated he watched the robber when holding him during their struggle. Tate also said he looked at the defendant several times in the early morning when the defendant was loitering in the garage. On redirect examination, Tate disclosed that he went to a police station on the afternoon of the robbery. There he looked at photographs in the form of movie slides. The record does not disclose whose picture was identified

by Tate, but he apparently recognized a movie slide of the defendant.

The State next called George Goodman, a mechanic for the cab company, who was working that day. He said he observed some strangers in the garage on the day of the robbery. Specifically, he testified he saw defendant in the garage between 8 o'clock and 10 o'clock that morning. Goodman's observation of the robbery consisted of seeing two men backing out of the garage and firing two shots. The distance from Goodman's work area to the cashier's cage was about 60 to 70 feet. Goodman said that earlier that day he observed defendant only for a few seconds from an unspecified distance. The next time he saw defendant was when he was backing out of the garage. This observation was at a distance of 15 feet as the men backed past his position in the garage. Goodman identified the defendant in court as this same individual. The witness gave this description: A dark individual, about 5 feet 8 inches tall and weighing about 150 pounds, wearing a green hat and no sunglasses.

The last identification witness was James Nixon, the assistant manager of the cab company. The robbery occurred about 40 feet from where he stood. Nixon said he observed an individual running backwards, firing three shots into the garage roof. His observation was at a 5-foot distance, limited to the time after the individual passed on his way out of the garage. Nixon's description was of a man 5 feet 7 inches tall, wearing a green sweater, dark glasses and a three-quarter length coat. The witness stated he observed the robber's face for about ten seconds, although prior to that time the individual was backing towards him. According to this witness, the lighting conditions were good. Nixon identified the defendant as the individual he saw that day. The witness admitted he did not see the defendant until sometime in February when he appeared in court to testify.

On cross-examination, the witness was unsure as to whether defendant was wearing a hat, nor was he positive as to the color of his hair. The witness could not describe the color or type of coat worn by the defendant. Further, Nixon's testimony was that he only saw one man leaving the garage and that he ran for cover when the shots were fired.

All of the State's identification witnesses stated that they did not participate in any pretrial identification procedure with regard to the defendant. All three witnesses admitted that the next time they observed the defendant after the robbery was in court, when they appeared to testify concerning the robbery. These instances occurred in February and April of 1968, about one to three months after the robbery. The defendant was arrested in Peoria, Illinois, and was subsequently returned to Chicago on February 23, 1968. It appears that the defendant was apprehended as a result of his picture being picked out by the witness Tate.

From the foregoing evidence, the defendant argues that the identification evidence is not sufficient to remove all reasonable doubt of his guilt. Defendant argues that "the attendant circumstances clearly afford great opportunities for mistake." Defendant characterizes the identification testimony of the State's witnesses as inconsistent and that this raises reasonable doubt of his guilt. The State argues that the record reflects that a positive identification was made of this defendant by all three occurrence witnesses.

The testimony of Tate, Goodman and Nixon was positive but as to the latter two witnesses contained some discrepancies that affected their testimony. Goodman said the man he observed was not wearing sunglasses when he left the garage. Nixon corroborated Tate's description of the defendant, but his testimony reveals that he ran for cover when shots were fired and that he only saw

one man fleeing the garage. However, even if we were to completely discount the testimony of Goodman and Nixon, the testimony of Tate still remains for our consideration.

 The State correctly maintains that the positive identification by one witness is sufficient to sustain a conviction. People v. Lamphear, 6 Ill2d 346, 128 NE 2d 892 (1955); People v. Marshall, 74 Ill App2d 472, 221 NE2d 128 (1966). The circumstances under which Wardell Tate observed the defendant were good. He stated that before the robbery he saw the defendant loitering around the garage; that during the robbery he struggled with the defendant in an attempt to abort the robbery; and he picked out a photograph of defendant which led to his apprehension. Despite some statements of Tate on cross-examination, his testimony was unshaken. The defendant has not convinced this court that the identification testimony was insufficient to prove his guilt beyond a reasonable doubt.

Defendant further complains that the failure to conduct a pretrial identification procedure and the circumstances of this case served to produce a mistaken identification in the instant case. The defendant argues that the fact that all of the identification witnesses next saw the defendant in court after the robbery was conducive to mistake. Defendant relies upon cases which are critical of showup procedures where a witness views a single individual under circumstances that seem to be suggestive. People v. Gardner, 35 Ill2d 564, 221 NE2d 232 (1966); People v. Sanders, 357 Ill 610, 192 NE 697 (1934); People v. DeSuno, 354 Ill 387, 188 NE 466 (1933); People v. Crane, 302 Ill 217, 134 NE 99 (1922).

 We are mindful of the rule that there is no requirement to conduct a lineup or any other pretrial identification procedure, People v. Boney, 28 Ill2d 505, 192 NE2d 920 (1963). Furthermore, the rule had been that the manner or method of identification goes to the weight

96

rather than the competency of the evidence, People v. Brinkley, 33 Ill2d 403, 211 NE2d 730 (1965). These principles have been tempered by the decision of Stovall v. Denno, 388 US 293 (1967), so that the admissibility of identification testimony will depend upon the circumstances of the case. In the Stovall case, the rule was announced that a violation of due process may result where the totality of the circumstances are "so unnecessarily suggestive and conducive to irreparable mistaken identification" as to deny an accused due process of law. We are of the opinion, based on a thorough review of the record, that the circumstances in the instant case were not so suggestive as to result in a mistaken identification of the defendant.

Finally, defendant contends that he was denied adequate representation and sufficient time to prepare for trial when the trial court denied his appointed counsel's motions for continuances. Prior to defendant's trial on July 16, 1968, the defendant was represented by private counsel from April 3, 1968, to June 19, 1968. On the latter date, private counsel withdrew and the Public Defender was appointed to represent defendant. The cause was continued to July 16, 1968. On that date, the Public Defender sought a further continuance. This motion was denied. It appears that defense counsel was notified the day before that the State was going to proceed on the armed robbery indictment, although defendant had an additional indictment pending. The trial commenced with jury selection and the State's case being presented on July 16. Following adjournment and up to the next morning, defense counsel sought to investigate this matter. Counsel attempted to contact some witnesses in Peoria, Illinois, who could purportedly establish an alibi for the defendant. The trial court was informed that he had the names and addresses of several witnesses and that he had talked to one witness who would be willing to testify

for defendant and say that defendant had registered at a motel in Peoria on the date of the robbery.

Pursuant to this information, the trial court granted a one-day continuance and the jury was excused until the next morning. Defense counsel sent an investigator to Peoria on July 17 and based on his information, sought another continuance on July 18. The investigator for the Public Defender's office testified outside the jury's presence that he attempted to contact the alibi witnesses in Peoria. He was successful in talking to one individual who said he saw defendant in Peoria the first week of January, but didn't say he saw defendant on January 4, 1968. The investigator also said he made a copy of a motel record which showed that a Mr. and Mrs. Thomas Smith were registered there on January 4, and January 5. This record was not introduced into evidence. The motion for continuance was denied.

Defendant contends that he had inadequate time to prepare his defense. His counsel argued that at the time the Public Defender was assigned on June 19, 1968, he had other cases which took priority; he did not know the trial would commence on July 16, 1968, and had intended to seek a continuance; and that he was not informed of the State's intention to proceed until the day before the trial. Defendant argues that although the granting of a continuance is within the trial court's discretion, one should be entitled to a continuance to prepare an adequate defense. People v. Kenzik, 9 Ill2d 204, 137 NE2d 487 (1956).

The rule of this State has been expressed in People v. Solomon, 24 Ill2d 586, 182 NE2d 736 (1962), at pages 589–90:

"The granting of a continuance to permit preparation for a case . . . necessarily depends upon the particular facts and circumstances surrounding the request, and is a matter resting within the sound

judicial discretion of the trial court. [Citations omitted.] Before a judgment of conviction will be reversed because of the denial of such a motion, it must appear that the refusal of additional time in some manner embarrassed the accused in preparing his defense and prejudiced his rights."

We are of the opinion that the trial court did not abuse its discretion in refusing defendant's motions for continuance on July 16 and 18. The defendant has not shown any embarrassment to his defense or prejudice of rights from this record. The record reveals that private counsel had been retained for almost three months. Nothing appears as to what was done by defendant's private counsel. The case was continued for about one month after the Public Defender was appointed. Once the trial began, the trial court granted a one day continuance to check out any alibi witnesses for the defense. The judge then heard testimony from an investigator as to his efforts to establish this defense. The testimony appeared to be inconclusive in proving defendant's alibi. Our examination of the record shows that defense counsel conducted an adequate defense.

We have reached this decision as to the denial of a continuance based upon an analysis of the facts and circumstances of this case. The cases relied upon by defendant are easily distinguishable. For instance, in our decision in People v. McNeil, 102 Ill App2d 257, 243 NE2d 576 (1968), we reversed a conviction because of prejudice manifested when the trial court refused a defendant's motion for a continuance after the State had indicated on the date of trial it was changing its election as to which of several indictments it now wished to prosecute. The instant case does not reveal such a split-second change of events that would prejudice defendant's right to adequate preparation and representation of counsel. The trial judge ruled properly in the in-

stant case in denying further continuance and we will not disturb that decision.

Therefore, the judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

BURMAN, P. J. and MURPHY, J., concur.